EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

and

Joann Bay, Intervenor,

v.

HAY ASSOCIATES, Defendant.

Civ. A. No. 78–3262.

United States District Court,
E. D. Pennsylvania.

Aug. 20, 1982.

Ruth Weyand, E. E. O. C. Washington, D. C., for plaintiff.

Miriam Gafni, Freedman & Lorry, Philadelphia, Pa., for intervenor.

Francis Connell, III, Richard Powell, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER,* District Judge.

### I. *Preliminary Statement*

This is an employment discrimination action brought by the Equal Employment Opportunity Commission to redress defendant Hay Associates' alleged discrimination against Joann R. Bay because of her sex, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–17 (1976). After we granted Bay leave to intervene as a party-plaintiff, she filed a complaint alleging in addition that Hay violated the Equal Pay Act, 29 U.S.C. § 206(d) (1976). Together the complaints assert that Hay discriminated against Bay with respect to her compensation and opportunities for promotion while she was employed as an executive financial analyst and counsellor;

---

* Of the United States Court of Appeals for the Third Circuit. At the time of the trial, Judge Becker was a district judge for the Eastern District of Pennsylvania.

that Hay constructively discharged her; and that Hay refused to rehire her in retaliation for her claims of discrimination.

The parties agreed to bifurcate the trial, reserving certain damages issues relating to compensation for the second phase. Trial of the first phase consumed about three weeks, after which the parties filed voluminous post-trial submissions. This opinion constitutes our Rule 52(a) findings of fact and conclusions of law on the liability issues.[1] We take this opportunity to compliment the excellent trial and post-trial work of the three very able lawyers for the parties.

The case arises in a professional setting in which employment decisions are rarely based on quantifiable, objective criteria. Instead, the subjective judgments of managers are often the reason for decisions about promotion and compensation. It is also true that the responsibilities of professional employees are often not amenable to exact description. Nonetheless, a clear picture of what actually occurred during Bay's employment at Hay emerged from the testimony at trial and the large number of exhibits submitted by the parties.

Hay is a partnership whose main office is located in Philadelphia. Its principal business, conducted in numerous American and foreign offices, is management consulting with particular emphasis on job classification, evaluation, and compensation.[2] In 1970 Hay created a division known as the Executive Financial Counselling Service ("EFCS") to furnish personal financial services to the executives of Hay's corporate clients. From the beginning EFCS has been an insular unit within Hay and not directly related to Hay's principal business activities.

Bay came to work at EFCS in March 1973. She was then age forty-six, having graduated from Bucknell University in 1948 and having completed a course of training at the Institute for Paralegal Training in Philadelphia in 1973. Immediately after finishing college, Bay taught school for two years and then left the work force to raise her family. During her years at home she participated in a wide variety of important community activities. In 1972 she decided to re-enter the work force. This decision led her to take the six-month paralegal training course, from which she was recruited by Hay.

Bay was employed by Hay until July 4, 1977, when she resigned. During that period she performed many tasks relating to personal financial analysis and planning. She received one significant promotion and several salary increases, but never achieved the title or compensation of men working in or hired into the division during her tenure, even though, she submits, she was doing work equivalent to theirs. Thus the plaintiffs contend that Hay violated section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) (1976), by delaying one promotion and refusing another to Bay because of her sex; by paying her a lower salary than men were paid for work requiring substantially the same skill, effort, and responsibility; and by constructively discharging her.[3] The

---

1. Though there is evidence in the record on damages, it is not complete due to the bifurcation agreed upon. Because the verdict on liability is for the plaintiff, we will afford the parties an opportunity to make a damages presentation that fits within the framework of this decision before calculating the award.

2. The parties do not dispute that at all relevant times Hay was an employer in an industry affecting commerce within the meaning of Title VII, 42 U.S.C. § 2000e (1976), and the Fair Labor Standards Act, 29 U.S.C. § 103 (1976 & Supp. IV 1980), of which the Equal Pay Act is a part.

3. During the trial we dismissed under Fed.R. Civ.P. 41(b) Bay's additional claim that Hay refused to rehire her in retaliation for her complaints about discrimination. See 42 U.S.C. § 2000e–3(a) (1976). This claim was predicated on Hay's failure to contact her when, four months after her resignation, EFCS sought an additional employee. The plaintiffs failed to show that Hay was aware that Bay was interested in returning. Because the plaintiffs did not show a causal connection between Bay's protected activities and Hay's adverse actions, they did not make out a prima facie case of retaliation. See Trout v. Hidalgo, 517 F.Supp. 873, 888 n.54 (D.D.C.1981); Equal Employment Opportunity Comm'n v. Locals 14 & 15, 438

plaintiffs also allege that Hay violated the Equal Pay Act by paying Bay less than men were paid for substantially equal work.

In addition to taking issue with the plaintiffs' factual contentions, Hay interposes a number of legal defenses. It raises statute of limitations defenses to significant portions of the Title VII and Equal Pay Act claims. It contends that Bay's allegations about her compensation are insufficient to establish either an Equal Pay Act violation or a Title VII "comparable work" claim. It also submits that the evidence does not, as a matter of law, permit the conclusion that Bay's resignation resulted from a constructive discharge.

In the wake of the trial, the parties have presented us with a very large number of proposed findings of fact, covering even the minutiae of the record. But we need not address the minutiae, because the critical facts emerge boldly from the record. We will therefore proceed to make findings only of the important subsidiary facts and then to state broadly our ultimate factual findings. This procedure is exceptionally appropriate with respect to Bay's equal pay claims, for we find no merit in many of them. We do, however, find that Bay was denied equal pay for equal work in the spring of 1977. We find in addition that, from 1975 through 1977, Bay was not promoted as she should have been because of her sex, and we conclude that this refusal to promote was a continuing violation of Title VII. Finally, we hold that Bay was constructively discharged in July 1977.

To place our findings in perspective, and because Hay has filed a post-trial motion to amend its answer to raise a statute of limitations defense, we turn first to the applicable limitations period.

## II. *The Limitations Period*

Hay asserts two defenses based on the applicable statutes of limitations. For evaluating these defenses, the pertinent dates are the following. Bay filed her charge of discrimination with the EEOC on December 9, 1977. The complaint of the EEOC was filed on September 29, 1978, alleging violations of Title VII. Bay's complaint in intervention was filed on April 3, 1979, alleging violations of the Equal Pay Act and Title VII.

Hay argues first that Bay cannot recover for any violations of the Equal Pay Act occurring before April 3, 1977, or before April 3, 1976, if they were willful, under 29 U.S.C. § 255(a) (1976). The predicate of this argument is that the filing date of Bay's rather than the EEOC's complaint is the pertinent one because the EEOC did not allege Equal Pay Act violations. The EEOC takes issue with this assumption because it now is empowered to enforce the Equal Pay Act, although it did not have that authority when its complaint in this action was filed.[4] The EEOC relies on Fed. R.Civ.P. 8(a), which requires only that a complaint state the grounds for relief and does not require identification of legal theories. *See* 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.14 (2d ed. 1982). When in 1979 enforcement of the Equal Pay Act became the responsibility of the EEOC, in that agency's submission, we acquired jurisdiction to apply the Act to the EEOC's claims.

If the EEOC is correct, the limitations period is enlarged by slightly more than six months. We will assume for the purpose of our discussion that the EEOC is correct, but we need not decide this question because we find that the plaintiffs have proven only that Hay violated the Equal Pay Act in the spring of 1977, which, in view of our finding that the violation was willful, is not within the disputed period of time.[5]

F.Supp. 876, 881 (S.D.N.Y.1977). In addition, at the time of the alleged retaliation Bay had not filed her charge with the EEOC.

**4.** *See* Exec.Order No. 12,106, 3 C.F.R. 263 (1979), *reprinted in* 42 U.S.C. § 2000e–4 (Supp.IV 1980). This order transferred all

equal pay enforcement functions from the Department of Labor to the EEOC.

**5.** Bay asserts that the pertinent date for calculation of the Equal Pay Act limitations period is July 1, 1979, the date that the EEOC acquired jurisdiction to enforce the Act. Since this posi-

Hay also seeks now to assert a second statute of limitations defense under Title VII. After the conclusion of the trial and after the parties' post-trial briefs had been filed, Hay moved to amend its answer to add an affirmative defense that Bay's promotion claims are time-barred. The substance of the proposed amendment would bar any claim that Bay should have been promoted before June 12, 1977, which was 180 days prior to the filing of her charge. *See* 42 U.S.C. § 2000e–5(e) (1976); *Bronze Shields, Inc. v. New Jersey Department of Civil Service*, 667 F.2d 1074, 1080 n. 14 (3d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982). We have not yet ruled on the motion to amend, and we now deny it.

 Hay asserts that it should be allowed to amend its answer either under subsection (a) or under subsection (b) of Fed.R.Civ.P. 15. Rule 15(b) permits pleadings to be amended to conform to evidence adduced at trial and ensures that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings." This subsection is not pertinent to Hay's proposed amendment. The purpose of Rule 15(b) is to authorize amendments to conform the pleadings to issues or evidence that appear for the first time at trial. *See Francois v. Francois*, 599 F.2d 1286, 1294 n.6 (3d Cir. 1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980); *Joiner Systems, Inc. v. AVM Corp.*, 517 F.2d 45, 48–49 (3d Cir. 1975). The Title VII statute of limitations is not an issue of this kind, but rather is one of which Hay was or should have been aware from the filing of the complaint. Thus Hay is not entitled to amend under Rule 15(b).

 Rule 15(a) requires us "freely" to grant leave to amend "when justice so requires." But leave to amend may be denied when the opposing parties would be substantially prejudiced by the amendment or when the amendment is unreasonably delayed. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 582 (1971); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 569 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We deny leave to amend because the plaintiffs would be prejudiced. The plaintiffs have represented to us in offers of proof filed in response to Hay's motion that if the limitations defense had been asserted they would have proven specific acts within the limitations period and would have identified precise dates. They have represented further that they would have proven that Hay had a "pattern or practice" of discriminating against its female employees with respect to promotions, *see Jewett v. International Telephone & Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); as it was, the case was tried strictly on the theory of disparate treatment, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Moreover, Hay has offered no explanation for its delay in raising the possible statute of limitations defense. The plaintiffs' pretrial memoranda advised Hay, if it did not know earlier, that Bay was asserting a continuing denial of promotion, in violation of Title VII, from 1975 through 1977.[6]

Under these circumstances, we conclude that Hay has waived the statute of limitations defense and we deny its motion for leave to amend its answer.[7] The limitations

---

tion is less advantageous to Bay than is Hay's position, we do not consider it.

**6.** Although we find a continuing violation on the merits of the promotion claims, we do not think that that determination is relevant to the proper disposition of Hay's motion to amend.

**7.** Thus we need not address Bay's alternative argument that the applicable limitations period is 300 rather than 180 days, since Pennsylvania is a deferral state. Bay contends in this regard that she should not be held responsible for the EEOC's failure to refer her charge to the Pennsylvania Human Rights Commission or the Philadelphia Commission on Human Relations. *See* 29 C.F.R. § 1601.13(d)(1) (1982).

period that applies to the promotion claims is that prescribed by 42 U.S.C. § 2000e–5(g) (1976), which gives us jurisdiction to award back pay from two years prior to the filing of the charge of discrimination, i.e., from December 9, 1975.

### III. Findings of Fact

#### A. The Parties

Our descriptions of the principal figures in this case—Bay, EFCS, Bay's superiors and co-workers, and certain Hay partners— is considerably more detailed than in the usual case. This detail results from the nature of the case, which deals with conflicting claims of professional competence and turns on credibility judgments about the personalities involved. We turn first to a description of EFCS and then to our evaluation of the principal figures.

#### 1. The Business of EFCS

At its inception, the services provided by EFCS consisted of a thorough review of a client-executive's financial affairs, including personal interviews and counselling, and culminated in the preparation of a lengthy and comprehensive EFCS report that contained the Hay consultant's recommendations on all aspects of the executive's financial affairs and estate planning concerns. These reports were known as "full-blown" reports. From 1970 until late 1974, EFCS's business consisted exclusively of one-to-one counselling and preparing "full-blown" reports. Because the executives were usually in the upper levels of management and earned in excess of $80,000 per year, the work of EFCS was highly sophisticated. Its services were paid for by the executive's corporate employers.

EFCS did well at first but by late 1973 its individual counselling business began to decline, because of a general downturn in the economy, the institution of wage-price controls, and an Internal Revenue Service ruling that made the EFCS service taxable as current income to the executives to whom it was provided. By early 1974 EFCS was beginning to experience serious financial difficulties, and EFCS thereupon undertook the development of an "executive financial planning seminar" program. This program had several facets, designed together to induce Hay's corporate clients to purchase EFCS services on a group basis for their executives. As the program was conceived, EFCS would invite representatives of client companies to sales or demonstration seminars, at which clients would be encouraged to retain EFCS to put on one or more "in-house" seminars for the client's executives. In-house seminars, in turn, would lead to interviews with the executives and the consequent preparation of EFCS reports. It was further contemplated that the client-executives would be middle-level managers and that shorter, "mini," rather than "full-blown" reports would be prepared.

The first seminar was given in July 1974 in Minneapolis, and others soon followed. During 1974 and 1975 EFCS continued to provide individual counselling and "full-blown" reports, although it eventually became clear that the seminars and follow-up "mini" reports were EFCS' only hope for survival. Business was poor throughout 1974, however, and EFCS' future was uncertain. During the next two years the EFCS seminar format underwent constant revision. Business did not begin to pick up until near the end of 1975 when the first important sales—to El Paso Gas Company and Southern Railway Company—were made as the result of a demonstration seminar given in Atlanta in August 1975.

During 1976 EFCS' business grew steadily. In that year EFCS presented eleven demonstrations and twenty-two in-house seminars for ten different customers. The in-house seminars generated a significant amount of mini-report business. The "mini" report was less sophisticated and less comprehensive than the "full-blown" report had been, but like a "full-blown" report it followed an interview between a Hay consultant and an executive.

Throughout the relevant period, EFCS was a small division. It never had more than ten professional employees, which number was reached in early 1973 when the individual counselling business was success-

ful. During 1973 through 1975, several of these employees resigned or were discharged. During most of 1976 and the first part of 1977, there were three to four professional employees in EFCS.

### 2. Joann Bay

Bay is a person of great intelligence. She is a quick learner, persistent and very resourceful. We introduce her personality because, at least in Hay's submission, it is one of the critical factors in this case. Hay's principal explanation for its judgment that Bay was not worthy of promotion and higher compensation was her alleged inability, by virtue of what was described as her monotone voice and lackluster personality, to inspire potential customers at various EFCS sponsored seminars to purchase EFCS's financial planning services. While conceding that Bay possessed excellent research and writing abilities, and that she performed the EFCS technical audit and report writing functions well, Hay contends that Bay lacked the "pizzazz" necessary to be or to become a successful seminar presenter.

We agree that Bay has an uninteresting voice and that she does not have a dynamic personality. We find, however, that she was a quite capable seminar presenter. That judgment is informed by the documentary and testimonial evidence of disinterested persons who attended various seminars and gave her high marks. Concomitantly, we reject the testimony of several interested witnesses, all Hay employees or their spouses, who gave her negative ratings. Furthermore, we find that, because EFCS's manager, Gordon C. Campbell, believed that women could play only a minor role in executive financial planning, Bay was not given adequate opportunities to participate in seminars, and so to improve her seminar skills. We find that had she been given such opportunities she would have performed considerably better as a seminar presenter. The testimony showed that none of the EFCS personnel was an effective presenter from the outset; instead, each improved with experience. As

will be discussed, Bay was given markedly less experience than her co-workers.

Bay has been portrayed by Hay as a "crybaby" (defendant's posttrial brief [DPTB], at 38); as an "ambitious person who constantly demanded to take on ever-increasing responsibilities with a great degree of confidence in her success" (DPTB 34); as being unable to appreciate limitations on her capabilities or to accept constructive criticism (DPTB 34); as vastly magnifying her skills (DPTB 35); as being self-absorbed (DPTB 36); as having a distorted perspective and constructing imagined versions of conversations to fit into her preconceptions (DPTB 37); and as having a tendency to nag fellow employees with her complaints to the point that they made perfunctory expressions of sympathy which she viewed as an endorsement of her grievances against Hay (DPTB 37). We agree that Bay was ambitious, a quality that we do not view in a negative light. We reject the balance of the characterizations of Bay's personality, finding no basis for them in the record and concluding that, insofar as these judgments are based upon specific incidents chronicled in the record, Bay's conduct constituted nothing more than a good-faith effort to better herself in an inhospitable environment.

### 3. Gordon C. Campbell

Campbell was the manager of EFCS during Bay's employment there. Campbell is a very able and experienced financial planner, and possesses good judgment in financial planning matters. In terms of his ability as a manager, he may be described as careful, conservative, and reluctant to innovate. For example, he resisted the transformation in EFCS's business from individual counselling to seminar presentation until it became clear that only the latter would permit EFCS to survive.

In personal terms, he is reserved and a gentleman, but a gentleman of the old school. At all times relevant to this case, Campbell had a significant "blind spot"—his inability to perceive of women as having a legitimate place in the business world in

general, and in the world of executive financial planning in particular. We underscore that Campbell's attitudes were not a function of ill will, for we find him to be a fundamentally decent person. We find nonetheless that, because of his attitudes, Campbell deliberately discriminated against Bay by denying her the recognition that she deserved and depriving her of the opportunity to develop her skills as a seminar presenter, as well as is in promotion.

While we do not base these conclusions about Campbell on any one incident but rather on the testimony as a whole, we note a number of incidents that reflect Campbell's bias. First, when Bay was hired in March 1973 Campbell classified her as a non-exempt, i.e., non-professional, employee though her position as a technical services auditor was a professional one. Bay did not discover this misclassification until December 1973, when she received an invitation to the clerical employees' Christmas party. At that time Campbell explained to her that he had so classified her, despite her professional position, because she had requested that available insurance benefits be used to augment her salary; Campbell also promised to discover what it would cost to change her classification. Yet not until eight months later, when Bay tendered her resignation to take a job she had been offered elsewhere, did Campbell do as he had promised and reclassify her.

Second, after the commencement of the seminar program Campbell at least twice inquired of Western Electric executives whether they would object to having a woman prepare financial counselling reports or make presentations at seminars. He testified that these inquiries were not prompted by clients' statements but by his perception that there might be some unhappiness if a female consultant was involved. Campbell similarly requested client evaluations of Bay's performance at seminars, although such evaluations had never been requested for a male member of the EFCS staff. Campbell also expressed to Bay his concern that Bay's husband would suffer for food and clean clothes while she was away on business trips.

Third, Campbell refused for a period of months after Bay attended seminars and was asked by clients for her business card to furnish her with business cards. Male professional employees of EFCS were given business cards at the time they were hired.

Finally, Campbell prepared a training program for one newly-hired professional male employee, Don Hyde, when the latter joined EFCS in 1977. This program included attendance as an observer at seminars, which opportunity was never afforded Bay, as we noted above. Indeed no training program of any kind was provided for Bay at any time, despite her requests for guidance to improve her skills and gain promotion.

### 4. Gerald Morlitz

Gerald Morlitz was the first technical services auditor in EFCS. When Bay was hired she was to assist and then replace him in that position. Morlitz, a graduate of Temple Law School, had a special interest in financial planning matters and an enormous talent for executive financial planning and, as later appeared, for effective seminar presentation. When EFCS shifted from individual counselling to seminars in 1975 and 1976, Morlitz was the acknowledged star of the show, surpassing all of the other seminar presenters. He was also the most adept and sophisticated consultant in EFCS in doing financial reports. Morlitz left EFCS in 1976 for a better-salaried position. It was Morlitz with whom Bay shared an office when she joined EFCS and Morlitz who trained her initially. During his tenure at EFCS, Morlitz supported Bay in her efforts to advance. At trial, he spoke well of her skills and work.

### 5. Chester Chambers

Chester Chambers was the EFCS employee who created the seminar program in 1974 and 1975. Chambers was an inventive and resourceful man, but a poor administrator. Chambers' seminar concept was implemented by Bay, who was truly his right arm during the development process.

Chambers' erratic performance overall led to his discharge in July 1975.

### 6. *Paul Thompson*

Paul Thompson was an accomplished seller of group life insurance—Hay was one of his customers—when he was hired by EFCS in January 1975. Thompson is intelligent, articulate, athletic-looking, and personable, all of which makes him a good salesperson. Thompson quickly became an important figure in EFCS. Though he was not at first a good seminar presenter, after an opportunity to develop his skills, he became a first rate seminar performer and was given a major role. In short course he also became equal in influence (though not in authority) to Campbell. When Campbell left EFCS, after Bay's departure, Thompson became the division manager.

Generally speaking, Thompson had a more sanguine attitude about the role of women in general, and Bay in particular, in the financial planning field. Nonetheless, on at least one occasion he asked a client whether he had any objection to EFCS assigning a woman to prepare a financial planning report. And Thompson, like Campbell, sought evaluations of Bay's seminar presentations from clients although he did not seek such evaluations of men's performances. At critical phases of the case, Thompson allied himself with Bay, against Campbell, in her attempts to achieve advancement. At the relevant times, however, Thompson was not in a position of authority.

### 7. *The Hay Partners*

Several Hay partners play a role in the case. Foremost among them is J. Robin Roark, Campbell's superior and the partner responsible for EFCS in 1976 and 1977. Roark is a man of considerable intelligence, a psychologist, and a good manager. He has been portrayed by Bay as unsympathetic to her plight. We find that Roark; Charles Van Horn, his predecessor as part-

ner responsible for EFCS; Daniel Glasner, another Hay partner with whom Bay spoke about her problems; and Milton Rock, the Chairman of Hay, were all essentially in the middle, concerned about what was happening but unwilling to second-guess Campbell. After considering the conflicting testimony about their roles in the case, and especially about remarks allegedly inhospitable to Bay, we do not credit allegations of bias on their part. Rather, we consider their role as neutral and ultimately of no effect. We treat Campbell, the manager of EFCS, as the party representing Hay policy in this litigation.

### 8. *Don Hyde*

When, toward the end of 1976, Hay determined that it would hire a new employee to participate in the seminar programs, Don Hyde was hired. Hyde had twenty-five years of business experience but lacked basic estate planning skills. Accordingly, he was sent, at Hay's expense, to the Main Line Paralegal Institute. Hyde was hired essentially because Campbell and Thompson were impressed with his presence, his apparent ability to communicate with others, and his comfortable appearance. He was hired at a higher position and a much higher salary than Bay held at the time, despite her experience and despite the fact that it was Bay who trained Hyde for many of his duties. After less than a year with EFCS it appeared that Hyde was incapable of doing the job and he was discharged.[8]

### B. *The EFCS Personnel Structure*

Above the level of clerical and administrative personnel, and below the level of top managers who were Hay partners, were four job classifications for the professional/executive personnel known as "consultants" who performed most of Hay's consulting work: associate, senior associate, principal, and senior principal. These classifications applied in EFCS as well as in all other Hay divisions. Bay's promotion

---

**8.** Hyde was replaced by Edd Hyde, Jr., who was no relation to him. Edd Hyde performed

satisfactorily and is still with EFCS.

claims relate to Hay's failure for a long period of time to promote her to the position of associate consultant, and then to promote her to the position of senior associate consultant. Hay had no written policy on the criteria for hiring or placing a consultant in a particular classification. Moreover, because of the professional character of the positions, job descriptions even within a division like EFCS were somewhat amorphous and were not comprehensive. There were no standards of training, skill, or responsibility that were associated peculiarly with the senior associate or principal consultant positions, for example. Instead, EFCS had a job description for "consultant." The consultant had two major functions: to provide personal financial counselling to individuals and groups, including writing reports, and to exercise administrative and organizational control over the seminar program. In EFCS, at least, there was a professional position below the consultant level. This was the technical services analyst position filled initially by Morlitz and subsequently by Bay.[9] The analyst's basic duty was to examine, extract, and summarize the personal financial data of client-executives for the use of consultants.

Consultants' salaries at Hay were related to job title or classification. At least from the fall of 1975, salaries in EFCS consisted of a base amount or guarantee and an annual incentive bonus that reflected the performance of the division. Every division manager at Hay was authorized, upon the approval of the partner in charge, to raise a consultant's salary above the base amount for his or her position classification. Moreover, when negotiating the salary for a new employee, a manager was free to meet that employee's demands. For example, Campbell testified that Don Hyde's starting salary was a function of Hyde's statement that he "needed a base salary of $24,000 for his living expenses." Accordingly, Campbell

paid Hyde $26,000: $18,000 base, $6,000 guarantee and an additional quarterly payment totaling $2,000. Campbell stated that he "could not get him for $18,000 plus incentive." Eighteen thousand dollars was at that time the base salary for a senior associate. That the flexibility or imprecision of consultant classifications also provided a vehicle for salary adjustment is shown by the hiring of Hyde as a senior associate.

Hay personnel at the consultant level were professionals. The evaluation of the competence of professionals was subjective at Hay and in EFCS. Promotions at the executive level did not depend on the existence of a specific vacancy. Rather, they depended on whether and when the person seeking promotion was considered capable of fulfilling the role subsumed within the higher job classification. The subjective nature of the promotion process was only enhanced by the lack of clearly articulated criteria for each consultant classification.

## C. *The Work Performed By Bay*

Bay joined EFCS in March 1973 as a technical services analyst or auditor. In that capacity she assisted consultants in the preparation of executive financial counselling reports by ensuring that the consultant had available to him all essential information, including the executive's insurance policies, wills, trust instruments, securities and investment lists, and deeds and mortgages. Her duties included analyzing that information; confirming stock or property values; researching applicable property, income, or estate tax laws; preparing individual client balance sheets; preparing income tax and estate tax projections; and assisting consultants in planning strategy and writing reports. There is no dispute that Bay performed these duties well. By 1974 Bay was doing all the auditing work in EFCS, including sophisticated follow-up work for existing clients.

9. Bay's first title was "technical services auditor." She was told when interviewed that she was being hired as Morlitz's replacement; Hay now asserts that she was hired as his assistant, thus, had a different title. For the purpose of this decision, it is unnecessary to decide whether there was one technical services classification or two because Bay's tenure in a technical services position is outside the Equal Pay Act and Title VII limitations periods.

Beginning in 1974 and continuing into 1975, as Chambers undertook the development of the seminar program, Bay assisted him in fleshing out ideas, drafting texts, and writing the early manuals. Morlitz also contributed significantly to this project, but the testimony showed that Bay was the person in EFCS best able to work closely and effectively with Chambers. Chambers, Bay, and Morlitz together selected the sites, target companies, and invitees for the first demonstration seminars held in the summer of 1974 in Minneapolis, Chicago, and Boston. All three fielded inquiries, and Bay and Chambers designed the promotional materials. Bay did not attend any of the 1974 demonstration seminars. Chambers attended all three, and Campbell and Morlitz each attended two. Campbell testified that Morlitz was sent to train him to assume Chambers' role. We note that at this time Morlitz, like Bay, was a technical services analyst. Morlitz was promoted to senior associate consultant in September 1974.

During this period Bay also continued her auditing work. She wrote increasingly sophisticated case studies and ghost-wrote financial counselling reports that were sent to clients over a consultant's signature. She designed the format for the first "mini" report (an estate planning report for Paul Wedel, President of Lancaster General Hospital), which was sent to Wedel in July 1975 over the joint signatures of Bay and Morlitz. In October 1975 she wrote her first "full-blown" financial counselling report, for Douglas Thomson, president of a consumer products division of Uniroyal. The report, which was signed by Morlitz and Bay, involved stock and other problems which Bay handled with great sophistication. Morlitz told Bay that Thomson was "impressed and pleased," and Campbell also complimented Bay's work.

The seminar program soon became the principal vehicle for the generation of report business for EFCS, and eventually became a major revenue producer in its own right. Bay was worked into seminar presentations slowly. She attended no seminars in 1974. In March 1975 she attended demonstration seminars in Philadelphia and New York. At these seminars she was permitted only to participate in a skit and to give a presentation, authored by her, entitled "The Woman's Viewpoint." This presentation emphasized the vital role of the executive's wife in the estate planning process.

Eventually, Bay was given the opportunity to make other presentations. For instance, at an Atlanta demonstration seminar in August 1975, she made an original presentation of ten to fifteen minutes on joint property, comparing the estate tax and other consequences of spouses holding property as joint tenants or as tenants in common. However, Bay's presentations at seminars were few in number and limited in scope as compared with those made by Campbell, Thompson, and Morlitz. In 1975, Bay attended four demonstration and no in-house seminars; Morlitz attended fourteen demonstration and five in-house seminars; Campbell attended six demonstration and one in-house seminars; and Thompson attended twelve demonstration and four in-house seminars. The statistics are similar for 1976. While Campbell attended nine demonstration seminars, and Thompson eleven, Bay attended only seven.[10] The number of in-house seminars attended was twenty for Campbell, twenty-two for Thompson, and one for Bay. Finally, in 1977, prior to Bay's resignation on July 4, she attended one demonstration and two in-house seminars; Campbell and Thompson each attended three demonstration and fifteen in-house seminars. At the seminars to which Bay was assigned, moreover, her participation was minimal compared to that of her male colleagues. For example, at the sole in-house seminar to which she was sent in 1976, she was assigned to present only "The Woman's Viewpoint." That was her usual role. She presented additional material at only four seminars over a two-year period.

---

10. Morlitz left EFCS early in 1976.

As the seminar activity generated "mini" report business, Bay wrote large numbers of "mini" reports, many more than her male co-workers. In 1976, Bay authored or drafted at least thirty-three reports, for total billings of about $21,000. Thompson wrote twenty-one reports, and Campbell, ten reports, for total billings of about $12,-000 and $16,000 respectively. Between January and June 1977, Bay wrote at least twelve reports; in all of 1977, Campbell wrote twelve and Thompson fifteen reports.[11] From 1975 to 1977 Bay also wrote most of the "full-blown" reports produced by EFCS: six, compared to Campbell's three and Thompson's one. She contributed significantly to the writing of the William Penn Case Study, which was planned as the form for the major EFCS reports. During this period she was also responsible for keeping up on the law, preparing research memoranda for her associates within EFCS, and revising and preparing manuals for seminars. There is no dispute that Bay's work on all these matters was excellent, and that she was diligent, technically competent, personable, and a helpful "team-player." Moreover, the record contains numerous compliments about Bay's abilities in these respects by Campbell, Thompson, and Morlitz.

Bay's work also was evaluated by EFCS clients, in terms of her seminar performances, her individual consultations, and her financial expertise, during her tenure at Hay and by way of testimony at trial. The clients' comments were uniformly favorable. As we have noted above, adverse reviews of Bay's seminar performance were made by interested witnesses whose testimony we do not credit. This is not to say that we find that Bay was a sterling seminar speaker; neither were Campbell and Thompson, though with experience they were better than she. We conclude, however, that Bay was a good seminar performer who promised to become a much better one if she was given the opportunity.

### D. Bay's Promotion to Associate Consultant

Bay joined EFCS at a salary of $8,400. In September 1973 she was given a raise of $600, and, in April 1974, a raise of another $600. In March 1975 she was promoted to the position of "consultant-trainee," and her salary was increased to $11,200. This followed Bay's request to Campbell to be promoted to the position of associate consultant, which he had denied. Bay had then gone to Campbell's supervisor, Van Horn, who agreed that she was entitled to be advanced and advised Campbell to promote her. Campbell, however, created the position of "consultant-trainee" for Bay, although no one in EFCS ever had held that title and although Campbell had told Bay when she was hired as a technical services auditor that *that* position would be excellent training for a consultant. Bay's salary of $11,200.00 was eighty percent of the consultant's base salary.

Thereafter followed the episode that the parties have termed the "phantom promotion." After she was made a consultant-trainee in March 1975, Bay periodically requested promotion to consultant status.[12] Campbell's consistent reply was that she needed "more seasoning." At a meeting in November 1975, apparently pursuant to the revision of the EFCS salary structure to put the division on an incentive system, Campbell advised Bay that she would remain at $14,000 (Campbell's and Thompson's base guarantees were being reduced). When she reminded him that she was earning only $11,200, he expressed surprise. On November 25 he filled out a personnel change of status form for Bay, on which he designated her as a "consultant" and listed her salary as $14,000, retroactive to September 1. She was told only that her salary was being increased, but not that she was promoted.

Campbell testified that his designation of her as a "consultant" rather than a "con-

---

11. These figures may not be exact, inasmuch as there are minor discrepancies between the figures produced by Hay in answers to interrogatories and from its billing records. We are satisfied that their import is accurate, however.

12. She also pressed Campbell for business cards, since she had been asked for them at the seminars she had attended. Campbell refused to provide them.

sultant-trainee" on the change of status form was an oversight, and that he did not promote her in November 1975. We do not credit this assertion. At his deposition, Van Horn stated that he had authorized Bay's promotion to consultant status at least by September 1975. We find that Campbell changed Bay's status because Van Horn believed that she had been promoted but that, at the same time, Campbell withheld this information from Bay because he did not wish to promote her. Campbell's asserted "oversight" would be extremely uncharacteristic, since all of the witnesses agreed that he was thorough, meticulous, and a "stickler for detail."

Not until February 1976 did Bay know that she had been promoted to associate consultant status and did she receive business cards. In January 1976, Bay had been notified by the benefits administrator, Sandy Middleton, that as a result of her promotion Bay was entitled to additional life insurance coverage. When Bay had told Middleton that there had been no promotion, Middleton showed her the personnel status change form in Campbell's handwriting. But when Bay confronted Campbell, he had claimed that Middleton was in error and Bay had not been promoted. She then told Thompson and Morlitz that she was considering leaving EFCS, and they decided to meet with Campbell. At that meeting, which took place in February, Thompson, speaking for the three, challenged Campbell's lack of involvement in the seminar program, which had become the mainstay of the business, and his failure properly to reward Bay with a promotion for her work. Campbell then publicly agreed to promote her, but never disclosed that she had actually been promoted earlier.[13]

E. *Bay's Efforts at Advancement to Senior Associate Status: The Don Hyde Matter*

In September 1976, Bay's salary was increased to $16,000 as a result of a general increase in salaries at EFCS. She received no additional increments and no further promotion before she submitted her letter of resignation on June 20, 1977. Bay first requested to be promoted to senior associate status in September 1976, when she told Roark, Van Horn's successor as the Hay partner responsible for EFCS, that she believed she deserved the promotion because of the nature of her work. As we have discussed, Bay wrote about the same number of "mini" reports in 1976 as Campbell and Thompson combined. Also, after Morlitz's resignation in March 1976, she assumed additional responsibilities that had been his, including manual revision, research, and marketing.

In late 1976 Bay learned that there were plans to hire a fourth consultant into EFCS and that candidates were being interviewed. Campbell and Thompson were intending to create two seminar "teams" of EFCS consultants, to be headed by Campbell and Thompson. Bay and the new consultant each would serve as the second member of a team. The consultant to be hired was expected to perform two tasks: first, to make presentations at seminars, and second, to carry out individual counselling assignments (including report writing) that arose from the seminars.[14]

In January or February 1977 Bay approached Roark to say that if the position to be filled would carry a higher salary and title, she wished to apply for it. Roark assured her that the new person would be doing the same work as she so that there would be no difference in salary or title. However, when Don Hyde was hired as the new consultant on April 1, 1977, he was hired as a senior associate with a guaranteed salary of $26,000, $10,000 more than Bay was earning. Hyde's resume disclosed no prior seminar activity and did not show any experience in estate planning analysis

---

13. Bay was not aware of the actual date of her promotion until the commencement of this litigation.

14. Hay now contends that EFCS intended to hire someone capable of being a seminar leader, like Campbell and Thompson. The evidence does not support this contention.

of the type that EFCS performed. His last previous employment had been as an investment management officer at First Pennsylvania Bank, and he had been out of work for about seven months when he joined EFCS.

Shortly after his arrival, it became clear that he lacked the basic estate planning skills that were required, and he was sent at Hay expense to the Main Line Paralegal Institute. In addition, Campbell prepared a training program for Hyde to prepare him for the work of EFCS, a program which included attendance at seminars as an observer. The opportunity to attend seminars as an observer had never been afforded Bay, despite the deficiencies that Campbell and Thompson perceived in her seminar performance. And no training program of any kind had ever been prepared for Bay, despite Campbell's continuing assertion that she needed "more seasoning." At the time Hyde was being interviewed and hired, Bay was seeking advancement to the position of senior associate. Although she was writing the bulk of the "mini" reports, attending seminars when sent by Campbell, writing most of the "full-blown" reports, revising seminar manuals as required, and performing a plethora of other duties, Campbell again told her that she "lacked seasoning" and was not ready for promotion.[15]

Bay thereupon asked Campbell to discuss with her her future "career path" at EFCS and to give her specific guidelines for reaching senior associate and principal status. On March 21, 1977, she sent him a five-page memorandum listing her contributions and her observations about her role at EFCS. She specifically noted how limited her seminar participation had been. In response to Bay's request, Campbell prepared a list of guidelines, which provided that, to attain senior associate status, Bay must:

1. Be able to analyze client benefits plans information (medical disability, pension, group life, stock option, savings plan, etc.) and articulate the essential points in copy for our case studies. This would include integration with the fact pattern of our "John Doe" for the client, and should be in readable, layman's language.

2. Have worked on developing improvements to our seminar materials (workshop manuals, case studies, handouts, etc.) as well as to our individual reports (counseling reports and post-seminar reports). This should encompass revisions in format, style, sequence of presentation, illustrative tables, etc., as well as grammatical and legal accuracy, all designed to enhance the utility of the materials to the client.

3. Be able to take an equal share of conducting seminar programs, in terms of any phase of the program (i.e., capital building, protection of assets and estate planning). This should involve the ability to lead the basic discussion, respond to degree of interest in a subject (in terms of expanding and contracting segments of the program), and to communicate the subject matter in a way that will interest, stimulate and motivate the participants.

We find that before the time these guidelines were prepared, Bay had achieved steps one and two, and that she had not proven her ability "to take an equal share of conducting seminar programs" only because she had been denied the opportunity to do so. We observe, moreover, that when Hyde was hired as a senior associate, he could perform none of the tasks listed as prerequisites to Bay's becoming a senior associate. Also important is the omission from Bay's copy of the guidelines memorandum of two paragraphs in the original which was sent to Roark. In part, these paragraphs stated:

My [Campbell's] major concern for Joann's future role in our division is the questionable success in seminar work. I have tried to be objective, but her physical appearance, her vocal monotone, and her humorless, uninspiring presentations have, perhaps, distorted my views.

Campbell's decision not to communicate this information to Bay belies the sincerity of

---

15. Bay's work contributed significantly to the financial success of EFCS. In 1977, two-thirds of EFCS's revenues were attributable to "mini" reports.

his efforts to provide guidelines for her, inasmuch as he thought Bay's seminar performance was the major obstacle to her promotion. We also find disingenuous his expression of concern about Bay's seminar performance. Campbell knew that clients reacted to her favorably; moreover, to the extent that her presentations were not as polished as they might have been, Campbell was responsible for limiting her seminar opportunities.[16]

Based on all of the foregoing, we conclude that, but for discrimination because of her sex, Bay was doing the work of and would have been promoted to the position of associate consultant on March 1, 1975, and that she was doing the work of and would have been promoted to the position of senior associate consultant on February 1, 1977.

### F. Bay's Work Compared to that of Others in EFCS

Using a series of occupational and temporal juxtapositions, the parties have argued and briefed at length the question whether Bay's work at any time within the limitations period was equal to or comparable to that of any of the male employees of EFCS during the time she was employed there, see note 21 infra. Bay contends that at various times her work was equal within the meaning of the Equal Pay Act to the work performed by Morlitz during the first nine months of 1974, immediately before his promotion to consultant; to work performed by Daniel Slack, a consultant in EFCS until 1975; and to work performed by Don Hyde between April and July 1977.[17]

We reject the first two of these comparisons. Because of the very different character of a consultant's work at EFCS before the beginning of the seminar program, Bay's work cannot be equated to Slack's. Nor can her work be equated to Morlitz's. Bay spent substantially more of her time

writing reports, "mini" and "full-blown," than Morlitz ever did. Morlitz concomitantly attended significantly more seminars than Bay did and assumed a lead role in them.

We find, however, that Bay did perform work between February and July 4, 1977, that was equal to the work performed by Hyde between April 1 and July 4, 1977. Hyde was hired to perform the work that Bay was doing, according to a plan in which each of them would be the second member of a seminar team, but he was paid $10,000 per year more than Bay was earning. Unlike Morlitz and like Bay, Hyde did not play a major role in seminars during his tenure at EFCS. He wrote some reports, although Bay wrote many more. He had no responsibilities that were different from hers; indeed, her work encompassed tasks in addition to those they both performed. We find that Hyde's previous business experience does not explain the salary difference, because that experience was unrelated to his work at EFCS; moreover, as we noted earlier, we reject Hay's contention that Hyde was being groomed for a leadership position. And we find that Hay's refusal to compensate Bay equally to Hyde was willful, inasmuch as Campbell knew the nature of Bay's and Hyde's work and Hay's obligations under the law.

Bay also asserts comparable work claims, i.e., that she was not being compensated equally well for work that was equally valuable to work performed by male employees of EFCS. We reject these claims for the same reasons that we reject her equal work claims relating to Morlitz and Slack. We observe, however, that to a large extent these claims are alternative to or subsumed in Bay's promotion claims.

### G. The Circumstances of Bay's Resignation

In late May 1977, after unsuccessful meetings with Roark, Campbell, and Rock,

---

16. We note our belief that Campbell's comments about Bay's physical appearance have sexist overtones. Bay is not unattractive, and we believe that Campbell would not have made similar comments had Bay been a man.

17. Bay does not contend that her work can be compared to that of either Campbell or Thompson.

the chairman of Hay, concerning advancement, and after learning that Hyde had been hired as a senior associate at a salary of $26,000, Bay was chagrined when Thompson asked her to assign some of the simpler reports to Hyde to help him learn the business. She was especially angry because these reports had been generated as a result of trips she had made to interview Northern Natural Gas executives in Omaha and Reynolds Aluminum executives in Richmond in mid-May. An argument ensued, during which Thompson told her that he had predicted that she would never be able to make an adequate seminar presentation. By May, Bay also believed that the office atmosphere had changed with Hyde's arrival. Campbell, Thompson, and Hyde were going to lunch together regularly, and excluding Bay from their socializing.

Bay testified that she felt she was in a "catch-22" situation. She had been told that she needed seminar participation for advancement, but even her limited seminar participation was threatened. She felt that she had persevered for four and one-half years in an inhospitable atmosphere but was making no progress. She was writing a large number of reports, but many were ghost-written for other consultants and the client was never made aware of her contribution or, at best, was told that she had been a second reader. Bay also testified that the comments of women at seminars that they were pleased to see a woman in the program made her feel like a hypocrite because it was clear to her that she was being treated unequally. Bay added that because of Hay's preeminence in the management consultant field, and its reputation for tutoring its clients on equal employment opportunity matters,[18] she felt hypocritical working for Hay at all. For these reasons, she felt compelled to resign and left EFCS on July 4, 1977.

We credit Bay's testimony about her emotions, and we find that any reasonable person would have reacted to the situation at EFCS much as she did. In light of the history of discriminatory treatment of her by Campbell discussed above, and which we reiterate in our conclusions of law, we find that Bay was constructively discharged.

### IV. Conclusions of Law

#### A. The Promotion Claims

Bay's promotion claims are based on the theory that Hay treated her differently than her male colleagues because of her sex. The elements of a prima facie case of disparate treatment under Title VII were prescribed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of race discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. These criteria are, of course, equally applicable to a prima facie case of sex discrimination. *Bryant v. International Schools Service*, 675 F.2d 562, 571 (3d Cir. 1982); *Kunda v. Muhlenberg College*, 621 F.2d 532, 541 (3d Cir. 1980). At the same time these criteria must be flexible to accommodate different factual situations. *Bryant v. International Schools Service, supra*, 675 F.2d at 562, 575; *Kunda v. Muhlenberg College, supra*, 621 F.2d at 542. In the case before us, the test must be

---

**18.** Bay introduced into evidence portions of a volume entitled *The Best of Men & Management*, published by Hay in 1971, which advised employers on compliance with Title VII and the Equal Pay Act. She also introduced a June 23, 1977, memorandum from the United States managing partner to all consultants, which discussed Hay's role in EEOC studies of job evaluation systems. This memorandum noted that "[w]e consistently and historically have taken the position (before it became popular) that job measurement must be free of bias and that compensation practices should reflect objectively measured job weight and individual performance."

adapted to reflect our finding that promotions at Hay did not depend on the existence of specific vacancies but rather were a function of individual readiness.

■ With this in mind, we have no difficulty concluding that Bay has established a prima facie case of sex discrimination in promotion in two respects: first, that but for her sex she would have been made an associate consultant on April 1, 1975; and second, that but for her sex she would have been made a senior associate consultant on February 1, 1977. She has shown both that she was qualified for these promotions and that Campbell and others at Hay were aware of her desire for promotion.

■ Once the plaintiffs establish their prima facie case, the burden of production[19] shifts to Hay to articulate a legitimate, nondiscriminatory reason for its refusal to promote Bay. Hay asserts that Bay was not promoted because her seminar performances were inadequate, specifically because they were pedestrian and uninspiring, and that no amount of experience would improve them. We conclude, however, that Bay has shown that this reason was merely a pretext for discrimination. *See Kunda v. Muhlenberg College, supra,* 621 F.2d at 542–43. We have found both that disinterested witnesses praised Bay's seminar performance—and that Campbell and the others were aware that clients responded positively to Bay—and that no employee of EFCS was a polished seminar presenter from the beginning.

Bay has bolstered her rebuttal case by producing independent evidence that Campbell intentionally discriminated against her because of her sex, for example, by inquiring of Western Electric's executives whether they would object to having financial counselling work done by a woman.[20] This independent evidence persuades us that Campbell's opinion of Bay's seminar skills was not merely a business judgment with

which we disagree. Bay has proven that Campbell's judgment and his subjective evaluations of her skills were dominated by his perception that women did not belong in the business world as financial consultants.

Accordingly, we hold that at the beginning of the Title VII limitations period, December 9, 1975, Bay should already have been an associate consultant, and earning an associate consultant's salary and incentive; and that on February 1, 1977, Bay should have been promoted to senior associate consultant status, and awarded an appropriate salary and incentive. We hold that Bay did not receive these promotions because of her sex in violation of Title VII, 42 U.S.C. § 2000e–2(a) (1976).

■ It is appropriate to explain that even if we had not denied Hay's motion to amend its answer to assert a statute of limitations defense, we would hold Hay liable for discrimination from December 9, 1975, because its refusal to promote Bay was a continuing violation. In *Jewett v. International Telephone & Telegraph Corp.,* 653 F.2d 89, 91 (3d Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981), the Third Circuit stated that "[s]uits may be brought by victims of one or more discriminatory acts occurring before the limitations period, so long as the plaintiff establishes that the offending practice is an ongoing one." *See also Croker v. Boeing Co.,* 662 F.2d 975, 990 (3d Cir. 1981) (in banc) (critical question is existence of present violation). Hay contends that we cannot find a continuing violation under *Jewett* because Bay has not shown that discrimination against women was Hay's "standard operating procedure." We do not read *Jewett* so narrowly. The *Jewett* court faced a situation in which promotion was based on specific vacancies, all of which had been filled more than 180 days before Martha Jewett filed her charge of discrimi-

---

**19.** The burden of persuasion does not shift. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Kunda v. Muhlenberg College, supra,* 621 F.2d at 543.

**20.** Customer preferences do not justify discriminatory behavior. *E.g., Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385, 389 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971).

nation. The case before us, by contrast, involves a fundamentally different personnel structure, in which promotion was not based on specific vacancies. Bay could have been promoted at any time, including the time within 180 days of the filing of her charge. Because of this difference, Bay could prove continuing discrimination without producing systemwide evidence. Bay has produced ample evidence that the "offending practice," i.e., intentional discrimination against her, was "an ongoing one."

## B. The Equal Pay and Comparable Work Claims

As we have mentioned, Bay's compensation claims rest on two theories. The first is the Equal Pay Act theory of unequal salaries for equal work; this theory is also incorporated in her Title VII allegations. The second is the more novel Title VII theory of unequal salaries for comparable work. See County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); IUE v. Westinghouse Electric Corp., 631 F.2d 1094 (3d Cir. 1980), cert. denied, 452 U.S. 967, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981); Comment, Sex-Based Discrimination Claims After County of Washington v. Gunther, 81 Colum.L.Rev. 1333 (1981); Note, Equal Pay, Comparable Work, and Job Evaluation, 90 Yale L.J. 657 (1981).

 To establish a prima facie case under the Equal Pay Act, Bay must show that she performed work that was "substantially identical" to the work performed by a better-paid male employee of EFCS. Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). Although she need not show that her work was iden-

tical in every respect to the work of that male employee, she must show that any difference in their content was so insignificant that it did not contribute to the pay disparity. Id. at 264; see also Angelo v. Bacharach Instrument Co., 555 F.2d 1164, 1171 (3d Cir. 1977); Usery v. Allegheny County Institution District, 544 F.2d 148, 153 (3d Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). Thus the focus of an Equal Pay Act claim must be overall job content. Because we have found that the content of Bay's work after February 1, 1977, was substantially the same as the content of Hyde's work after he was hired on April 1 of that year, Bay has established a prima facie violation of the Act.[21]

 On the other hand, Bay has not shown that her work at any time within the limitations period was equal to work ever performed by Morlitz or Slack. As we have discussed fully in our findings, Morlitz had more responsibility and different job duties; and Slack, at a minimum, had different job duties. The plaintiffs have directed us to Equal Pay Act decisions involving teachers and holding that "teaching is teaching" regardless of the subjects taught, e.g., Katz v. School District, 557 F.2d 153 (8th Cir. 1977), and argue that "consulting is consulting" regardless of the particular means used, whether reports or seminars. We believe that the teachers' cases are not apposite. The concept of financial consulting at EFCS was much more amorphous than the concept of teaching in the cases cited and was only broadly related to job content, which is our polestar.[22]

 To defeat Bay's prima facie case with respect to Hyde, Hay must prove[23]

---

**21.** The Equal Pay Act applies to jobs held successively as well as simultaneously. Roesel v. Joliet Wrought Washer Co., 596 F.2d 183, 186–87 (7th Cir. 1979); Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1049 (5th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). On the basis of the present record, there appears no reason to doubt that Hyde would have received the same salary on February 1, 1977, that he received when he joined

EFCS, but we reserve this issue for the second phase of the trial.

**22.** Even if the difference between Bay's job and that of Morlitz was a product of discrimination against her in the areas of responsibility and promotion, such discrimination is not cognizable under the Equal Pay Act.

**23.** Under the Equal Pay Act, unlike Title VII, the burden of persuasion shifts to the employer

that the salary difference was based on seniority, merit, a system that measured earnings "by quantity or quality of production," or "any other factor other than sex," 29 U.S.C. § 206(d)(1) (1976). Hay asserts that Bay and Hyde were compensated differently on the basis of two neutral factors: first, that EFCS expected to gain greater economic benefit from Hyde's work, *see Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589 (3d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973); and second, that Hyde was hired to assume a leadership role in the EFCS seminars as soon as possible. We reject this second factor as a factual matter; we have found that Hyde was hired to perform the same type of work as Bay, i.e., as the second member of a seminar team.

We reject Hay's first proffered "factor other than sex" on both legal and factual grounds. First, Hay cannot use economic benefits to justify the payment of unequal salaries to Bay and Hyde for the performance of the same work unless it proves that Hyde's work actually was more profitable. *See Pearce v. Witchita County*, 590 F.2d 128, 134 (5th Cir. 1979) (higher collection rate of male credit manager might explain raises during employment but could not justify different starting salaries of male and female credit managers); *Hodgson v. Robert Hall Clothes, Inc., supra*, 473 F.2d at 597 (defendant proved that men's clothing department, in which all salespersons were male, was more profitable than women's clothing department, in which all salespersons were female). No such showing was made by Hay.[24] Indeed, Hay could not make such a showing because it is Hyde's starting salary that is at issue. Second, the only explanation offered by

Hay for its *expectation* that Hyde's work would be more profitable than Bay's is that Hyde's job would be different and more responsible, an explanation which we have already rejected.[25] Our findings that Hyde and Bay were to do the same work and that Hyde's prior business experience was not related to his duties at EFCS distinguish this case from those cited to us by Hay, e.g., *EEOC v. Aetna Insurance Co.*, 616 F.2d 719, 726 (4th Cir. 1980) (higher starting salary paid to male commercial casualty underwriter with substantial related underwriting experience than was paid to female underwriter did not violate Equal Pay Act).

Accordingly, we hold that Hay violated the Equal Pay Act, 29 U.S.C. § 206(d) (1976), by paying Bay $16,000 per year for work performed in the spring of 1977 and paying Hyde $26,000 per year. Further, we hold that this violation was willful and within the limitations period of 29 U.S.C. § 255(a) (1976). To be "willful" within the meaning of the limitations statute, Hay's actions must have been knowing, in the sense of awareness of its obligations under the Act, and voluntary. *See Marshall v. A & M Consolidated Independent School District*, 605 F.2d 186, 190 (5th Cir. 1979); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 462–63 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). We conclude that this standard is met, and we find, consonant with our findings on Bay's promotion claims, that Hay's discrimination against Bay with respect to her salary was intentional.

We turn now to Bay's second theory of salary discrimination, which is that she was denied an equal salary for comparable work,[26] which is work that differed in content but was equally valuable to the

---

once the plaintiff establishes a prima facie case. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

24. Bay showed that two-thirds of the revenue of EFCS in 1977 was derived from report-writing, which was her major activity. Even if we were to accept Hay's representation that Hyde was expected to assume a different and more active seminar role than Bay, we would be

inclined to reject the economic benefit defense for this reason.

25. Hay never attempted to prove that Hyde could or might bring new clients to Hay because of his prior business contacts.

26. Such pay discrimination claims are also known as "comparable worth" claims. *E.g.*, Comment, *supra*, 81 Colum.L.Rev. at 1333.

work performed by men in EFCS. *See* Note, *supra*, 90 Yale L.J. at 657 n.5. It is clear after the Supreme Court's decision in *County of Washington v. Gunther, supra*, that such claims are cognizable under Title VII. *See also I. U. E. v. Westinghouse Electric Corp., supra.* The elements of such comparable work claims have yet to be defined, however, and we need not undertake this task in the case before us. For the reasons given in our discussion of her equal work claims, Bay simply has not proffered evidence from which we might infer with any confidence that her work was comparable or equally valuable to that of any male in EFCS other than Hyde.

### C. *The Constructive Discharge Claim*

The doctrine of constructive discharge was first developed in cases under the National Labor Relations Act. In recent years, the doctrine has been incorporated in Title VII law to protect employees who are compelled to resign because of working conditions made intolerable by discrimination. To the best of our knowledge the Third Circuit has not addressed constructive discharge in the context of either labor relations or civil rights, so we turn to cases in other circuits for guidance.

The courts that have considered constructive discharge claims under Title VII agree that the plaintiff must show that her employer deliberately made working conditions so intolerable that a reasonable person would have been forced to resign. *E.g., Welch v. University of Texas*, 659 F.2d 531, 533 (5th Cir. 1981); *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981); *Heagney v. University of Washington*, 642 F.2d 1157, 1166 (9th Cir. 1981); *Alicea Rosada v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). The requisite intent, in the majority view, involves the deliberate creation of intolerable conditions or purposeful discrimination, rather than an intent to get rid of the plaintiff. *See Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir. 1980) (plaintiff need not show purpose to compel resignation but must show aggravating circumstances); *Clark v.*

*Marsh, supra*, 665 F.2d at 1173–74 & n. 5 (adopting *Bourque* standard); *Alicea Rosada v. Garcia Santiago, supra*, 562 F.2d 114, 119 (plaintiff must show that employer created conditions "so difficult or unpleasant" that reasonable person would resign). *But see Muller v. United States Steel Corp.*, 509 F.2d 923, 929 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) (plaintiff must show "a deliberate effort to make things difficult . . . so as to bring about his separation.").

At the same time, the fact of purposeful discrimination alone does not suffice to prove constructive discharge. The policy of nondiscrimination embodied in Title VII is best served when it is possible to attack discrimination "within the context of existing employment relationships," *Bourque v. Powell Electrical Manufacturing Co., supra*, 617 F.2d at 66. But recognizing that working conditions may be made so bad by discrimination that departure is an employee's only realistic choice, courts have found constructive discharges when the plaintiff was able to prove discrimination and the existence of aggravating circumstances.

In *Clark v. Marsh, supra*, the plaintiff resigned from her position as temporary Director of the Army Office of Employment Policy and Grievance Review after a recent law school graduate with no supervisory experience was permanently appointed to that position. In the preceding five years, the plaintiff had actively sought various promotions and lateral transfers, for which she was qualified, but had received only one permanent promotion. The district court found that these events were the result of sex discrimination. The District of Columbia Circuit held that the plaintiff had been constructively discharged, because she experienced "a continuous pattern of discriminatory treatment encompassing deprivation of opportunities for promotion, lateral transfer, and increased education training, existing over a period of several years," 665 F.2d at 1174. In this pattern, said the court, were found the necessary aggravating circumstances: the "historic

discrimination" against the plaintiff; her repeated, ineffective formal and informal attempts to obtain relief; and "the predictable humiliation and loss of prestige accompanying her failure to obtain [the Director's] position." *Id.* at 1175–76.[27]

Our review of the cases shows that the First, Fifth, Sixth, Ninth, and District of Columbia Circuits have announced essentially the same standards for deciding constructive discharge cases. We predict that the Third Circuit would adopt them as well. Applying these standards, we find *Clark v. Marsh* most like the case before us. Bay has established a prima facie case that she was constructively discharged by showing that Campbell in particular deliberately created intolerable working conditions, within the meaning of the cases, as a result of sex bias. We already have held that Hay, acting through Campbell, discriminated against Bay with respect to her opportunities for advancement continuously from the spring of 1975 and with respect to her compensation in the spring of 1977. We find ample evidence of aggravating circumstances in the pattern of obstacles to Bay's advancement that Campbell created and which are detailed in our findings. Among other things, we note the following. Twice, in 1974 and again in 1976, Bay had to threaten resignation to obtain advancement in salary or title. In 1975, Bay had to go to Campbell's superior, Van Horn, to attain consultant status. Even after she spoke to Van Horn, who assured her that she would be promoted, Campbell created the new, inferior position of "consultant-trainee." In 1976, Campbell misrepresented her status to her during the "phantom promotion" episode. In late 1976 or early 1977, Campbell and Roark told Bay that an additional person was being hired to perform the same job as she, at the same salary and title, and she was advised not to apply for the position; when Don Hyde joined EFCS on April 1, 1977, however, Campbell made him a senior associate consultant and gave him a base salary of $26,000. In March and April 1977, during the course of Campbell's "career path" discussions with Bay, he informed her that she could advance only if she participated significantly in EFCS seminars; at the same time, he continued to deny her the opportunity to participate. Moreover, when Hyde proved his inability to present at seminars, Campbell sent Hyde to seminars as an observer, which we had never done for Bay. When Hyde had to learn report-writing, Bay was asked to train him, and to give him some of the reports she was doing in her own name. With respect to her own report-writing, Bay suffered the frustration of ghost-writing a significant number of them so that the client thought that she was a "second reader" or never knew of her work.

Throughout, Bay was aware of Campbell's discriminatory attitudes and conduct. She tried going to his superiors, who, we have found, generally took a "hands off" approach which did nothing to better her work conditions. She also broached the subject with Campbell, in her March 21, 1977, memorandum, mentioning his phone calls to the Western Electric executives, but Campbell did not respond. We credit her claims that she felt hypocritical, in view of the fact that Hay advertised its expertise in the area of equal employment opportunity. We conclude, in light of the foregoing, that by June 1977 Bay was "locked into a posi-

27. Other constructive discharge cases are similar. The Fifth Circuit held in *Welch v. University of Texas, supra,* that a woman who obtained her doctorate while working as a research assistant was constructively discharged after her supervisor told her that he did not want a woman doctor working for him and asked her when she was leaving. *See also Meyer v. Brown & Root Construction Co.,* 661 F.2d 369, 372 (5th Cir. 1981) (plaintiff constructively discharged when her employer assigned her to warehouse work several months after she informed him she was pregnant); *Jacobs v. Martin Sweets Co.,* 550 F.2d 364, 369 (6th Cir.), *cert. denied,* 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977) (pregnant, unmarried plaintiff who was terminated as executive secretary and transferred was constructively discharged); *cf. Heagney v. University of Washington, supra* (proof of discriminatory compensation alone will not support constructive discharge claim); *Bourque v. Powell Electrical Manufacturing Co., supra,* 617 F.2d at 65 (same).

tion from which she could apparently obtain no relief," *Clark v. Marsh, supra,* 665 F.2d at 1174.

Hay is entitled to rebut Bay's prima facie case by showing that her resignation was attributable to nondiscriminatory factors, *see Meyer v. Brown & Root Construction Co., supra,* 661 F.2d at 372. Hay contends that Bay has not shown that her working conditions were intolerable, because she testified that Campbell treated her in a civil, businesslike, gentlemanly fashion. We reject this proffered defense because verbal or physical harassment is not a necessary element of proof of constructive discharge. We stress that what is at issue is not Campbell's personal relationship with Bay but his professional relationship with her. Campbell deliberately thwarted Bay's advancement, however courteously he treated her. By June 1977, when Bay submitted her resignation, he had made it plain by his conduct that Bay could not expect further promotion and had to accept a subordinate role of writing and ghost-writing reports.

We find that under these circumstances any reasonable person would have been compelled to resign. Accordingly, we hold that Bay was constructively discharged because of her sex, in violation of Title VII, 42 U.S.C. § 2000e–2(a) (1976).

### V. *Conclusion*

In sum, we hold that Hay violated Title VII deliberately and continuously from 1975 by delaying Bay's promotion to associate consultant and by failing to promote her to senior associate consultant on February 1, 1977. We further hold that Hay willfully violated Title VII and the Equal Pay Act during the spring of 1977 by failing to pay Bay and Don Hyde equal salaries for equal work; our determination of the precise dates of the violation will await a hearing on damages. Finally, we hold that Hay violated Title VII by constructively discharging Bay because of her sex.

We deny Hay's post-trial motion to amend its answer to assert a defense based on the Title VII statute of limitations. We make no findings on damages at this time, but await the parties' presentation of evidence at the second phase of the trial.